```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )        8:07CV20
                               )
         v.                    )
                               )
2004 SILVER CHEVROLET          )    MEMORANDUM OF DECISION
MINIVAN,                       )
VIN 1GBFG15T041229457,         )
                               )
              Defendant.       )
                               )
```

This is a civil forfeiture action brought pursuant to 18 U.S.C. 983 against a Chevrolet Minivan used in the transportation of marijuana. The claimant, Darrell Mooring, is the registered owner of the vehicle and contests the forfeiture.

Congress has declared certain property to be forfeitable to the United States. 21 U.S.C. 881(a)(4) ("vehicles . . . used . . . to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [controlled substances]"). To prevail, the government must meet the following burden by a preponderance of the evidence:

> [I]f the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense.

18 U.S.C. 983(c)(3); 18 U.S.C. 983(c)(1) (requiring a preponderance of the evidence).

> [T]he United States bears the initial burden of establishing probable cause to connect property to drug trafficking. See United States v. $39,873.00, 80 F.3d 317, 318 (8th Cir. 1996). . . . The government meets

> this burden by presenting evidence which creates "more than a mere suspicion but less than prima facie proof" that the seized property is related to drug trafficking. Id. In making a probable cause determination, the district court must look to "the 'aggregate' of all facts," considering both direct and circumstantial evidence. United States v. U. S. Currency in the Amount of $150,660.00, 980 F.2d 1200, 1206 (8th Cir. 1992).

U.S. v. $141,770.00 in U.S. Currency, 157 F.3d 600, 603 (8th Cir. 1998).

In showing a "substantial connection," the government is not required to establish that persons using the property were later found guilty of a covered criminal offense. However, the seizure of the property must not have violated the constitutional rights of any person claiming an interest in it.

> The Fourth Amendment's exclusionary rule applies to quasi-criminal forfeiture proceedings. If the currency and other contents of [claimant's] vehicle should be suppressed because of an unconstitutional search or seizure, the government must prove probable cause with other, untainted evidence.

U.S. v $404,905.00 in U.S. Currency, 182 F.3d 643, 646 (8th Cir. 1999) (citations omitted).

To determine whether there was a "substantial connection" in this case, the principal issue to be decided is whether the stop and search of the minivan conducted by Sarpy County Deputy Sheriff Todd C. Merritt violated the Fourth Amendment, that is, whether the stop was supported by probable cause, and if it was, whether the continued detention and the search of the defendant vehicle were supported by reasonable suspicion and, as applicable, probable cause.

FACTS

On June 26, 2006 Deputy Merritt was conducting traffic control on Interstate 80 in Sarpy County near the Gretna interchange. He was in uniform in a marked Crown Victoria cruiser, accompanied by his canine, "Dakota." Deputy Merritt is an experienced law enforcement officer. He has been a Sarpy County Sheriff's Deputy since 1991. He has been a canine handler since April, 2004, certified as a team with his dog, "Dakota," by the Omaha Police Department following a five-week training and certification testing in 2004. He and his dog have been recertified as a team each year since. Prior to this traffic stop they were last recertified in May, 2006. Merritt testified that he and Dakota have conducted between 800 and 1,000 total searches.

Deputy Merritt noticed an eastbound minivan at approximately mile marker 429-30 which changed traffic lanes without signaling. He watched the minivan and observed it "drifting" to the right of the lane and saw it cross over the lane marker line three times. He followed the minivan and saw it change lanes to the outside lane, and although it did signal, it changed lanes without signaling for 100 feet prior to the lane change. He activated his lights and stopped the minivan without incident.

The stop and ensuing events are captured on a videotape made from Deputy Merritt's in-car video camera, mounted near the rear-view mirror of his cruiser. Although the microphone was frequently not operating, there is enough dialogue on the tape to be helpful. The camera was activated automatically when Deputy

Merritt activated his overhead lights to stop the minivan. The actual traffic violations are not shown on the videotape.

After the stop, Deputy Merritt approached the passenger front window of the minivan. The passenger opened the window, and stared straight ahead. Merritt asked for the driver's license, the vehicle's registration and proof of insurance. He smelled an "overwhelming" odor of raw, that is, unburned, marijuana. When he received the documents he asked the driver, identified as the claimant, to exit the minivan, which he did. Merritt conversed briefly with him at the rear of the minivan, and asked him to have a seat in the patrol unit while he did some checking of the documents. Merritt looked into the rear windows of the minivan, but testified he could not see inside because of the tinting of the windows. Mooring protested being placed in the cruiser, asking what he had done wrong and saying he was allergic to dogs. Nevertheless, he did sit in the deputy's cruiser.

He advised Mooring of the reasons he had stopped him. Mooring said, "Oh." Merritt asked Mooring who was in the vehicle and where he was headed. Mooring told him the passengers in the vehicle were his cousin and his uncle and they were on their way to "Nebraska," later specifying "Omaha," so the passenger could contact the daughter of Mooring's cousin. He did not know the cousin's last name, nor the daughter's name, nor her address in Omaha, but said he intended to call a family member to get directions once they got to Omaha. In response to other questions, Mooring said he'd known the front seat passenger for twenty-five years, from California, where they lived. He also said the person in the back seat was not actually his "biological" uncle, but rather his grandmother's sister's son,

4

and Mooring simply referred to him as an uncle.  Mooring identified the back-seat passenger as Ceasar Bostic and said he'd come along because he knew directions and to help Mooring drive.  Mooring further stated that they intended to be in Omaha a day or two, and then might possibly go back by way of Arkansas because he had family there.  In response to Merritt's question, Mooring said he had served time when he was younger for "stupid stuff" involving gang activity and a gun, and admitted he had shot someone, but said he had just been protecting himself.  He said he had no prior drug convictions, though, and had no weapons in the vehicle.

   Merritt went back to the minivan to verify whether the VIN on the dashboard matched the VIN on the inside driver's door jam.  When he opened the driver's door, he "immediately" smelled marijuana again.  He then proceeded to the passenger side of the minivan, contacted the passenger, and requested identification.  The passenger complied with Merritt's request that he exit the vehicle.  Merritt asked the passenger, later identified as Kevin Crump, where they were going.  Crump responded "somewhere up the road" that was "close," but could not say exactly.  He told Merritt that the purpose of the trip was that "possibly" someone had died.  He said he had come along "for the ride," and they were going to be in Nebraska one or two days.  Crump said he had no prior arrests, which Merritt learned later was not correct, as Merritt was advised by his dispatcher that Crump's record included drug convictions.  Crump's manner of speaking was very slow and deliberate, and Merritt observed him to be drooling.

   Merritt then asked the back-seat passenger for identification and spoke with him about their destination and purpose.  That passenger, Bostic, gave Merritt a California

5

identification card.  He said they were going to Omaha for a family reunion over the Fourth of July, that Mooring was Bostic's biological nephew, and that they intended to be in Omaha until the reunion, at that time eight days hence.

Merritt returned to the cruiser and called his dispatcher to request information on the status of the driver's operators license, the passengers' identification and prior arrest records, as well as other information.  Eventually, he was advised that Mooring's driver's license was current, there were no "wants or warrants" for him, and he had a previous felony drug conviction involving a gun as well as other drug violations.  He then confirmed with Mooring that the person they were visiting in Omaha was his relative, but not related to anyone else in the minivan.  Merritt asked Mooring for permission to look inside the vehicle to see what was inside, whereupon Mooring said that he considered that a violation of his privacy rights and accused Merritt of racial profiling.  Merritt responded that he does the same things during other traffic stops and denied any racial profiling.

Merritt returned Mooring's and the others' identification and the other documents.  He then asked Mooring if there were any weapons, drugs, or large amounts of cash in the vehicle.  Mooring said there were not.  Merritt asked Mooring for permission to search the vehicle, and Mooring immediately refused consent. Merritt then approached the front seat passenger and asked him for permission to search his bags in the vehicle, and Crump, too, refused consent.  Merritt then asked Bostic for permission to search his bags in the vehicle, and he also refused.

Another officer had arrived, and Merritt asked the men to exit the minivan while he took his dog around the vehicle to sniff it. They complied. Merritt advised his dispatcher he was taking the dog out of his cruiser, and proceeded to take the dog around the minivan. The dog went around the vehicle one time and did not indicate to the odor of narcotics. On the second time around it, Merritt commented to Dakota "You can smell it, too, just like I can smell it." He opened the passenger side doors and directed the dog into the vehicle. Merritt testified that Dakota immediately went to a bag in the back seat area and sat down, his indication that he had found the strongest source of the odor of narcotics.

The three men were then arrested and the minivan was searched, resulting in the discovery of approximately thirty-five pounds of marijuana.

## DISCUSSION AND LEGAL ANALYSIS

The deputy's testimony was unequivocal that three traffic violations occurred before he turned on his overhead lights to stop the minivan, automatically activating the video camera. The videotape clearly shows an "L" on the screen at the commencement of the videotape, meaning that the cruiser's lights had been activated. It is reasonable that the deputy would not have activated his lights prior to the occurrence of the traffic violations. In addition, when the deputy later advised the driver of the violations, the driver did not protest that the violations had not occurred.

On the other hand, the videotape shows the minivan making a nearly duplicative pattern of changing lanes.  It begins showing the minivan traveling in the far left (of three) lanes.  It then signals a lane change to the middle lane, and once it is in the middle lane, does not weave or drift in that lane.  It also does not cross the white lane marker, and it signals prior to and as it moves to the far right lane after passing a truck.  The last turn signal persists for at least four seconds before the right tires of the minivan cross the white lane marker, which far exceeds 100 feet at Interstate speeds.  Finally, the minivan crosses the "fog line" on the right of the far right lane, but pulls back into the driving lane just before it goes under the underpass at the Gretna interchange.  The deputy testified that he can manually activate his video camera, and there was no testimony that the minivan had *returned* to the far left or center lanes just before the deputy activated his lights, thus raising questions of the accuracy of the deputy's testimony that the violations giving rise to the stop all preceded his turning on his overhead lights, and even whether they happened at all.

Deputy Merritt was a credible witness, even though his testimony had certain inconsistencies.  I credit his testimony, despite misgivings about the unexplained images on the videotape once it was activated.  The evidence preponderates in favor of the conclusions that the traffic violations occurred, and that they preceded the activation of the video camera.  Because there is no evidence to the contrary, I so find.

"Any traffic violation--however minor--creates probable cause to stop the driver of a vehicle."  United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002), quoting United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993).  A valid traffic

stop may not be challenged on the ground that it was a pretext for other investigation.  <u>Whren v. United States</u>, 517 U.S. 806 (1996).  Since changing lanes without signaling for at least 100 feet before the lane change is a violation of Nebraska's rules of the road, see <u>Neb. Rev. Stat.</u> Section 60-6,161(2), there was probable cause for deputy Merritt to initiate a traffic stop.  The stop did not violate the Fourth Amendment.

    Deputy Merritt testified that after he approached the vehicle at the passenger side front window, when that window was opened by the passenger, later identified as Crump, he immediately smelled the odor of raw marijuana.  He smelled it again when he went back to the minivan to check the VIN.  In fact, he stated that this smell was more "overwhelming" than at any other stop he had conducted in his entire law enforcement career.  Arguably, once the officer smelled what he recognized to be the odor of raw marijuana, probable cause existed to search the vehicle.  See, <u>Johnson v. United States</u>, 333 U.S. 10, 13 (1948); <u>United States v. Barry</u>, 394 F.3d 1070 (8th Cir. 2005) (officer who saw mist inside vehicle and smelled marijuana and air freshener had "at a minimum, reasonable suspicion" to detain the defendant); <u>United States v. Gipp</u>, 147 F.3d 680, 685 (8th Cir. 1998) (citing cases holding odor alone provided probable cause; finding that officer smelling marijuana during a "welfare check" of a parked vehicle, had a "particularized and objective basis" for suspecting appellant was or had recently engaged in criminal activity . . . .", quoting <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981).  See also <u>State v. Watts</u>, 209 Neb. 371, 374 (1981) ("[T]he smell of marijuana, standing alone, is sufficient to furnish probable cause for the warrantless search of a motor

vehicle where . . . there was sufficient foundation as to the expertise of the officer").

Merritt's subsequent questioning quickly fueled his suspicions. The driver and one passenger were not truthful about their past criminal histories, which included drug convictions. All three occupants of the vehicle had different stories about the purpose of the trip. Crump didn't know their destination. Bostic gave a different story about the anticipated length of stay in Omaha. Bostic and Mooring were inconsistent in disclosing what their biological relationship was. Mooring had said Bostic was along to help drive, but Bostic did not produce a driver's license. Crump looked straight ahead during Merritt's initial contact with them, and was drooling, which, combined with his slow speech and the marijuana odor, made Merritt believe, reasonably, that Crump was high on a controlled substance.

CONCLUSIONS

Taking the totality of the circumstances, there was not only reasonable, articulable suspicion for conducting the dog sniff, but indeed, there was probable cause to search the vehicle even without the drug sniff. <u>Barry</u>, <u>supra.</u> The search did not violate the Fourth Amendment. The contents of the bags of marijuana found in the vehicle clearly establish a "substantial relationship" between the vehicle and the controlled substances offense of marijuana trafficking.

Having found that probable cause for the search existed even before the dog sniff, I need not decide whether the deputy's opening the vehicle's doors and directing the dog to enter it

violated the Fourth Amendment.  In this case the circumstances sufficiently established probable cause to search the vehicle even if the dog had not been present at all.  Thus, the marijuana would have "inevitably" been discovered in any event.

     I therefore conclude that the government has met its burden of proof.  There was no evidence to the effect that the claimant was an "innocent owner" of the minivan within the provisions of the applicable statute.  18 U.S.C. 983(d).  Therefore the minivan must be forfeited to the United States.

     IT THEREFORE HEREBY IS ORDERED,

     Judgment of civil forfeiture shall be entered for the United States.

     DATED this 19th day of June, 2007.

                         BY THE COURT:

                         s/ *David L. Piester*
                         David L. Piester
                         United States Magistrate Judge