IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:07CV20 |
| | ) | |
| v. | ) | |
| | ) | |
| 2004 SILVER CHEVROLET | ) | MEMORANDUM OF DECISION |
| MINIVAN, | ) | |
| VIN 1GBFG15T041229457, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This is a civil forfeiture action brought pursuant to
18 U.S.C. 983 against a Chevrolet Minivan used in the
transportation of marijuana.  The claimant, Darrell Mooring, is
the registered owner of the vehicle and contests the forfeiture.

Congress has declared certain property to be forfeitable to
the United States. 21 U.S.C. 881(a)(4) ("vehicles . . . used
. . . to transport, or in any manner to facilitate the
transportation, sale, receipt, possession, or concealment of
[controlled substances]").  To prevail, the government must meet
the following burden by a preponderance of the evidence:

> [I]f the Government's theory of forfeiture is that the
> property was used to commit or facilitate the
> commission of a criminal offense, or was involved in
> the commission of a criminal offense, the Government
> shall establish that there was a substantial connection
> between the property and the offense.

18 U.S.C. 983(c)(3); 18 U.S.C. 983(c)(1) (requiring a
preponderance of the evidence).

> [T]he United States bears the initial burden of
> establishing probable cause to connect property to drug
> trafficking.  See United States v. $39,873.00, 80 F.3d
> 317, 318 (8th Cir. 1996). . . .   The government meets

> this burden by presenting evidence which creates "more
> than a mere suspicion but less than prima facie proof"
> that the seized property is related to drug
> trafficking.  <u>Id</u>.  In making a probable cause
> determination, the district court must look to "the
> 'aggregate' of all facts," considering both direct and
> circumstantial evidence.  <u>United States v. U. S.</u>
> <u>Currency in the Amount of $150,660.00</u>, 980 F.2d 1200,
> 1206 (8th Cir. 1992).

<u>U.S. v. $141,770.00 in U.S. Currency</u>, 157 F.3d 600, 603 (8th Cir.
1998).

In showing a "substantial connection," the government is not
required to establish that persons using the property were later
found guilty of a covered criminal offense.  However, the seizure
of the property must not have violated the constitutional rights
of any person claiming an interest in it.

> The Fourth Amendment's exclusionary rule applies to
> quasi-criminal forfeiture proceedings. If the currency
> and other contents of [claimant's] vehicle should be
> suppressed because of an unconstitutional search or
> seizure, the government must prove probable cause with
> other, untainted evidence.

<u>U.S. v $404,905.00 in U.S. Currency</u>, 182 F.3d 643, 646 (8th Cir.
1999) (citations omitted).

To determine whether there was a "substantial connection" in
this case, the principal issue to be decided is whether the stop
and search of the minivan conducted by Sarpy County Deputy
Sheriff Todd C. Merritt violated the Fourth Amendment, that is,
whether the stop was supported by probable cause, and if it was,
whether the continued detention and the search of the defendant
vehicle were supported by reasonable suspicion and, as
applicable, probable cause.

2

FACTS

On June 26, 2006 Deputy Merritt was conducting traffic control on Interstate 80 in Sarpy County near the Gretna interchange.  He was in uniform in a marked Crown Victoria cruiser, accompanied by his canine, "Dakota."  Deputy Merritt is an experienced law enforcement officer.  He has been a Sarpy County Sheriff's Deputy since 1991.  He has been a canine handler since April, 2004, certified as a team with his dog, "Dakota," by the Omaha Police Department following a five-week training and certification testing in 2004.  He and his dog have been recertified as a team each year since.  Prior to this traffic stop they were last recertified in May, 2006.  Merritt testified that he and Dakota have conducted between 800 and 1,000 total searches.

Deputy Merritt noticed an eastbound minivan at approximately mile marker 429-30 which changed traffic lanes without signaling. He watched the minivan and observed it "drifting" to the right of the lane and saw it cross over the lane marker line three times. He followed the minivan and saw it change lanes to the outside lane, and although it did signal, it changed lanes without signaling for 100 feet prior to the lane change.  He activated his lights and stopped the minivan without incident.

The stop and ensuing events are captured on a videotape made from Deputy Merritt's in-car video camera, mounted near the rear-view mirror of his cruiser.  Although the microphone was frequently not operating, there is enough dialogue on the tape to be helpful.  The camera was activated automatically when Deputy

3

Merritt activated his overhead lights to stop the minivan.  The
actual traffic violations are not shown on the videotape.

     After the stop, Deputy Merritt approached the passenger
front window of the minivan.  The passenger opened the window,
and stared straight ahead.  Merritt asked for the driver's
license, the vehicle's registration and proof of insurance.  He
smelled an "overwhelming" odor of raw, that is, unburned,
marijuana.  When he received the documents he asked the driver,
identified as the claimant, to exit the minivan, which he did.
Merritt conversed briefly with him at the rear of the minivan,
and asked him to have a seat in the patrol unit while he did some
checking of the documents.  Merritt looked into the rear windows
of the minivan, but testified he could not see inside because of
the tinting of the windows.  Mooring protested being placed in
the cruiser, asking what he had done wrong and saying he was
allergic to dogs.  Nevertheless, he did sit in the deputy's
cruiser.

     He advised Mooring of the reasons he had stopped him.
Mooring said, "Oh."  Merritt asked Mooring who was in the vehicle
and where he was headed.  Mooring told him the passengers in the
vehicle were his cousin and his uncle and they were on their way
to "Nebraska," later specifying "Omaha," so the passenger could
contact the daughter of Mooring's cousin.  He did not know the
cousin's last name, nor the daughter's name, nor her address in
Omaha, but said he intended to call a family member to get
directions once they got to Omaha.  In response to other
questions, Mooring said he'd known the front seat passenger for
twenty-five years, from California, where they lived.  He also
said the person in the back seat was not actually his
"biological" uncle, but rather his grandmother's sister's son,

4

and Mooring simply referred to him as an uncle.  Mooring
identified the back-seat passenger as Ceasar Bostic and said he'd
come along because he knew directions and to help Mooring drive.
Mooring further stated that they intended to be in Omaha a day or
two, and then might possibly go back by way of Arkansas because
he had family there.  In response to Merritt's question, Mooring
said he had served time when he was younger for "stupid stuff"
involving gang activity and a gun, and admitted he had shot
someone, but said he had just been protecting himself.  He said
he had no prior drug convictions, though, and had no weapons in
the vehicle.

     Merritt went back to the minivan to verify whether the VIN
on the dashboard matched the VIN on the inside driver's door jam.
When he opened the driver's door, he "immediately" smelled
marijuana again.  He then proceeded to the passenger side of the
minivan, contacted the passenger, and requested identification.
The passenger complied with Merritt's request that he exit the
vehicle.  Merritt asked the passenger, later identified as Kevin
Crump, where they were going.  Crump responded "somewhere up the
road" that was "close," but could not say exactly.  He told
Merritt that the purpose of the trip was that "possibly" someone
had died.  He said he had come along "for the ride," and they
were going to be in Nebraska one or two days.  Crump said he had
no prior arrests, which Merritt learned later was not correct, as
Merritt was advised by his dispatcher that Crump's record
included drug convictions.  Crump's manner of speaking was very
slow and deliberate, and Merritt observed him to be drooling.

     Merritt then asked the back-seat passenger for
identification and spoke with him about their destination and
purpose.  That passenger, Bostic, gave Merritt a California

identification card.  He said they were going to Omaha for a
family reunion over the Fourth of July, that Mooring was Bostic's
biological nephew, and that they intended to be in Omaha until
the reunion, at that time eight days hence.

    Merritt returned to the cruiser and called his dispatcher to
request information on the status of the driver's operators
license, the passengers' identification and prior arrest records,
as well as other information.  Eventually, he was advised that
Mooring's driver's license was current, there were no "wants or
warrants" for him, and he had a previous felony drug conviction
involving a gun as well as other drug violations.  He then
confirmed with Mooring that the person they were visiting in
Omaha was his relative, but not related to anyone else in the
minivan.  Merritt asked Mooring for permission to look inside the
vehicle to see what was inside, whereupon Mooring said that he
considered that a violation of his privacy rights and accused
Merritt of racial profiling.  Merritt responded that he does the
same things during other traffic stops and denied any racial
profiling.

    Merritt returned Mooring's and the others' identification
and the other documents.  He then asked Mooring if there were any
weapons, drugs, or large amounts of cash in the vehicle.  Mooring
said there were not.  Merritt asked Mooring for permission to
search the vehicle, and Mooring immediately refused consent.
Merritt then approached the front seat passenger and asked him
for permission to search his bags in the vehicle, and Crump, too,
refused consent.  Merritt then asked Bostic for permission to
search his bags in the vehicle, and he also refused.

Another officer had arrived, and Merritt asked the men to exit the minivan while he took his dog around the vehicle to sniff it.  They complied.  Merritt advised his dispatcher he was taking the dog out of his cruiser, and proceeded to take the dog around the minivan.  The dog went around the vehicle one time and did not indicate to the odor of narcotics.  On the second time around it, Merritt commented to Dakota "You can smell it, too, just like I can smell it."  He opened the passenger side doors and directed the dog into the vehicle.  Merritt testified that Dakota immediately went to a bag in the back seat area and sat down, his indication that he had found the strongest source of the odor of narcotics.

The three men were then arrested and the minivan was searched, resulting in the discovery of approximately thirty-five pounds of marijuana.

### DISCUSSION AND LEGAL ANALYSIS

The deputy's testimony was unequivocal that three traffic violations occurred before he turned on his overhead lights to stop the minivan, automatically activating the video camera.  The videotape clearly shows an "L" on the screen at the commencement of the videotape, meaning that the cruiser's lights had been activated.  It is reasonable that the deputy would not have activated his lights prior to the occurrence of the traffic violations.  In addition, when the deputy later advised the driver of the violations, the driver did not protest that the violations had not occurred.

On the other hand, the videotape shows the minivan making a
nearly duplicative pattern of changing lanes.  It begins showing
the minivan traveling in the far left (of three) lanes.  It then
signals a lane change to the middle lane, and once it is in the
middle lane, does not weave or drift in that lane.  It also does
not cross the white lane marker, and it signals prior to and as
it moves to the far right lane after passing a truck.  The last
turn signal persists for at least four seconds before the right
tires of the minivan cross the white lane marker, which far
exceeds 100 feet at Interstate speeds.  Finally, the minivan
crosses the "fog line" on the right of the far right lane, but
pulls back into the driving lane just before it goes under the
underpass at the Gretna interchange.  The deputy testified that
he can manually activate his video camera, and there was no
testimony that the minivan had *returned* to the far left or center
lanes just before the deputy activated his lights, thus raising
questions of the accuracy of the deputy's testimony that the
violations giving rise to the stop all preceded his turning on
his overhead lights, and even whether they happened at all.

Deputy Merritt was a credible witness, even though his
testimony had certain inconsistencies.  I credit his testimony,
despite misgivings about the unexplained images on the videotape
once it was activated.  The evidence preponderates in favor of
the conclusions that the traffic violations occurred, and that
they preceded the activation of the video camera.  Because there
is no evidence to the contrary, I so find.

"Any traffic violation--however minor--creates probable
cause to stop the driver of a vehicle."  United States v.
Linkous, 285 F.3d 716, 719 (8th Cir. 2002), quoting United States
v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993).  A valid traffic

stop may not be challenged on the ground that it was a pretext
for other investigation.  Whren v. United States, 517 U.S. 806
(1996).  Since changing lanes without signaling for at least 100
feet before the lane change is a violation of Nebraska's rules of
the road, see Neb. Rev. Stat. Section
60-6,161(2), there was probable cause for deputy Merritt to
initiate a traffic stop.  The stop did not violate the Fourth
Amendment.

Deputy Merritt testified that after he approached the
vehicle at the passenger side front window, when that window was
opened by the passenger, later identified as Crump, he
immediately smelled the odor of raw marijuana.  He smelled it
again when he went back to the minivan to check the VIN.  In
fact, he stated that this smell was more "overwhelming" than at
any other stop he had conducted in his entire law enforcement
career.  Arguably, once the officer smelled what he recognized to
be the odor of raw marijuana, probable cause existed to search
the vehicle.  See, Johnson v. United States, 333 U.S. 10, 13
(1948); United States v. Barry, 394 F.3d 1070 (8th Cir. 2005)
(officer who saw mist inside vehicle and smelled marijuana and
air freshener had "at a minimum, reasonable suspicion" to detain
the defendant); United States v. Gipp, 147 F.3d 680, 685 (8th
Cir. 1998) (citing cases holding odor alone provided probable
cause; finding that officer smelling marijuana during a "welfare
check" of a parked vehicle, had a "particularized and objective
basis" for suspecting appellant was or had recently engaged in
criminal activity . . . .", quoting United States v. Cortez, 449
U.S. 411, 417 (1981).  See also State v. Watts, 209 Neb. 371, 374
(1981) ("[T]he smell of marijuana, standing alone, is sufficient
to furnish probable cause for the warrantless search of a motor

9

vehicle where . . . there was sufficient foundation as to the expertise of the officer").

Merritt's subsequent questioning quickly fueled his suspicions.  The driver and one passenger were not truthful about their past criminal histories, which included drug convictions. All three occupants of the vehicle had different stories about the purpose of the trip.  Crump didn't know their destination. Bostic gave a different story about the anticipated length of stay in Omaha.  Bostic and Mooring were inconsistent in disclosing what their biological relationship was.  Mooring had said Bostic was along to help drive, but Bostic did not produce a driver's license.  Crump looked straight ahead during Merritt's initial contact with them, and was drooling, which, combined with his slow speech and the marijuana odor, made Merritt believe, reasonably, that Crump was high on a controlled substance.


CONCLUSIONS


Taking the totality of the circumstances, there was not only reasonable, articulable suspicion for conducting the dog sniff, but indeed, there was probable cause to search the vehicle even without the drug sniff.  Barry, supra.  The search did not violate the Fourth Amendment.  The contents of the bags of marijuana found in the vehicle clearly establish a "substantial relationship" between the vehicle and the controlled substances offense of marijuana trafficking.

Having found that probable cause for the search existed even before the dog sniff, I need not decide whether the deputy's opening the vehicle's doors and directing the dog to enter it

10

violated the Fourth Amendment.  In this case the circumstances
sufficiently established probable cause to search the vehicle
even if the dog had not been present at all.  Thus, the marijuana
would have "inevitably" been discovered in any event.

I therefore conclude that the government has met its burden
of proof.  There was no evidence to the effect that the claimant
was an "innocent owner" of the minivan within the provisions of
the applicable statute.  18 U.S.C. 983(d).  Therefore the minivan
must be forfeited to the United States.

IT THEREFORE HEREBY IS ORDERED,

Judgment of civil forfeiture shall be entered for the United
States.

DATED this 19th day of June, 2007.

BY THE COURT:

s/ *David L. Piester*

David L. Piester
United States Magistrate Judge

11